**GARFIELD SLOPE HOUSING CORP., Plaintiff,**

v.

**PUBLIC SERVICE MUTUAL INSURANCE CO., Defendant.**

**Nos. 94–CV–4009(ERK), 96–CV–3462(ERK).**

United States District Court, E.D. New York.

Aug. 5, 1997.

employment discrimination.

Paul C. Matthews, New York City, for Plaintiff.

Stuart M. Hertz, Garden City, NY, for Defendant.

## MEMORANDUM & ORDER

KORMAN, District Judge.

This is an insurance coverage dispute. Plaintiff ("Garfield" hereinafter) owns and manages two, cooperative apartment buildings. In September 1991, Garfield decided to install new carpet in the hallways of both buildings. At the time, Garfield's board of directors, which makes all management and maintenance decisions for Garfield, was headed by Rhonda Zwillinger, who owned an apartment in one of the buildings, 162 Garfield Place. Zwillinger warned the board that new carpet released chemical fumes that posed certain health risks for persons like her, who are "chemically sensitive." The board nonetheless decided to proceed with the carpeting project, although it acceded to Zwillinger's request to have the installer use a special type of adhesive to contain the new-carpet fumes.

The carpet was installed on or about October 10, 1991. Carella Aff. ¶ 7. At the next board meeting on October 13, 1991, Zwillinger complained about the effect the new-carpet fumes were having on her, she requested removal of the carpet, and she resigned from her post as president of the board. Zwillinger sent a handwritten letter to Garfield's shareholders, dated October 29, 1991, which asked for the immediate removal of the carpet and offered to contribute $600.00 to replace it with linoleum. Lalande Aff. Exh. J. She also threatened a lawsuit for "quiet enjoyment" if Garfield did not remove the carpet by November 10, 1991. *Id.* Garfield subsequently had the carpet removed from Zwillinger's building before that date.

Zwillinger did not mention the matter again. The following year, she sold her apartment and ultimately relocated to Arizona. In August 1994, some two years and nine months after the carpet was removed, Zwillinger filed suit against Garfield and the carpet's manufacturer, installer, distributor, etc., alleging a variety of negligence claims and asserting that she developed "Multiple Chemical Sensitivity" as a result of her 1991 exposure to the carpet fumes at 162 Garfield Place. *See Zwillinger v. Garfield Slope Housing Corp., et al.,* No. 94–CV–4009 (removed to the Eastern District from Supreme Court of New York, Kings County, on August 24, 1994). When Garfield received the complaint and summons for this action, it immediately forwarded the papers to its insurance broker, who promptly forwarded them to defendant ("Public Service" hereinafter), Garfield's general liability insurer for the period June 15, 1991 through June 15, 1992. *See* Carella Aff. ¶ 11; Goldman Aff. Exh. E.

On September 13, 1994, Public Service notified Garfield that it was disclaiming coverage under the 1991 liability policy. Goldman Aff. Exh. H. Garfield then filed the instant third-party complaint, seeking a declaratory judgment that Public Service is obligated to defend and indemnify Garfield with respect to the *Zwillinger* action. Public Service now moves for dismissal of Garfield's action on jurisdictional grounds, or, in the alternative, for summary judgment in its favor. Garfield

opposes this motion and cross-moves to implead Public Service into the *Zwillinger* action.

## DISCUSSION

### 1. *Jurisdiction*

■ Public Service correctly observes that the parties here are not diverse; thus subject matter jurisdiction has not been independently established for Garfield's declaratory judgment action pursuant to 28 U.S.C. § 1332 (1996). Contrary to Public Service's contentions, however, the absence of diversity jurisdiction does not compel dismissal of Garfield's action, for ancillary jurisdiction over this third-party complaint has been established pursuant to 28 U.S.C. § 1367(b) (1996). A third-party complainant, such as Garfield, is not required to establish an independent jurisdictional basis for its action in order to implead a third-party defendant, such as Public Service, into another action for which jurisdiction has already been established. *See Agrashell, Inc. v. Bernard Sirotta Co.*, 344 F.2d 583, 585 (2d Cir.1965) ("[E]ven without diversity of citizenship between the [third] parties, Sirotta [the third-party plaintiff] would have been permitted to implead Hammons [a non-diverse, third-party defendant] in the federal courts, so long as there was subject matter jurisdiction of Agrashell's [original plaintiff's] suit against Sirotta [original defendant]."); 6 Charles Alan Wright, Arthur R. Miller, & Mark Kay Kane, *Federal Practice and Procedure* § 1444, at 321–22 (2d ed. 1990) ("[I]t is well settled that there need be no independent jurisdictional basis for such a [third-party] claim if diversity of citizenship exists between the original parties.").

### 2. *Timely Notice of "Occurrences"*

■ Public Service contends that the 1991 Zwillinger incident was an "occurrence" and that Garfield's failure timely to notify Public Service of this incident entitles Public Service to summary judgment. The liability policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Goldman Aff. Exh. E, Commercial General Liability Form § V ("Definitions"),

¶ 9, at 8. Pursuant to this policy, Garfield "must see to it that we [Public Service] are notified as soon as practicable of an 'occurrence' or offense which may result in a claim." *Id.* at § IV, ¶ 2(a), at 6.

■ "[C]ompliance with the notice provisions in an insurance contract is a condition precedent to an insurer's liability." *American Ins., Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 438 (2d Cir.1995); *accord Sparacino v. Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir.1995). The reasons for this are several:

> [These provisions] enable insurers to make a timely investigation of relevant events and exercise early control over a claim. Early control may lead to a settlement before litigation and enable insurers to take steps to eliminate the risk of similar occurrences in the future. When insurers have timely notice of relevant occurrences, they can establish more accurate renewal premiums and maintain adequate reserves.

*Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir.1987). Thus, failure timely to notify an insurer of an "occurrence" can "constitute[ ]" a complete defense to a third-party complaint by the insured to compel the insurer to bear the costs of defense in the underlying action." *State of New York v. Blank*, 27 F.3d 783, 793 (2d Cir.1994). A finding of prejudice to the insurer, resulting from unreasonable delay in notifying it of an "occurrence," is not required for an insurer to successfully assert this defense. *See AXA Marine & Aviation Ins. Ltd. v. Seajet Indus., Inc.*, 84 F.3d 622, 624 (2d Cir.1996) (holding that no-prejudice rule applies to untimely notice of both an "occurrence" and "claim"); *Blank*, 27 F.3d at 797; *Sparacino*, 50 F.3d at 143 (citing for support *Security Mut. Ins. Co. v. Acker–Fitzsimons Corp.*, 31 N.Y.2d 436, 340 N.Y.S.2d 902, 905, 293 N.E.2d 76, 78 (1972)).

■ In fixing the date upon which an insured becomes obligated to notify its insurer of an "occurrence," all relevant facts known to the insured on the date in question must be evaluated. *Christiania Gen. Ins. v. Great Am. Ins.*, 979 F.2d 268, 275 (2d Cir.

1992). The standard is one of objective reasonableness:

> [T]he insured's knowledge of events that create only a very distant possibility of a claim may not trigger a notice of occurrence provision so long as the insured has a good faith and reasonable belief that no liability covered by the policy will result.... A notice of occurrence provision thus focuses on the insured's knowledge of events and reasonable conclusions based on that knowledge.... As we noted in *Blank,* "if insureds were required to notify insurers of every incident that poses even a remote possibility of liability, insurers would soon be swamped with notice of minor incidents that pose little danger [of liability]."

*American Ins.,* 56 F.3d at 439 (quoting *Blank,* 27 F.3d at 795) (citations omitted); *accord Christiania Gen. Ins.,* 979 F.2d at 275–76. The burden of demonstrating the reasonableness of an insured's good faith belief that a particular incident is either not covered by its liability policy or could not reasonably be expected to give rise to liability on its part rests with the insured, *White v. City of New York,* 81 N.Y.2d 955, 598 N.Y.S.2d 759, 760, 615 N.E.2d 216, 217 (1993). "The existence of ... [such] a 'good-faith belief', as well as the question of whether the belief was reasonable, are ordinarily questions of fact for the factfinder[.]" *Argentina v. Otsego Mut. Fire Ins. Co.,* 86 N.Y.2d 748, 631 N.Y.S.2d 125, 126, 655 N.E.2d 166, 167 (1995).

Garfield plausibly contends that bodily injury resulting from exposure to malodorous carpet was plainly a "remote contingenc[y] far removed from the particular [liability] policy in question," *Christiania Gen. Ins.,* 979 F.2d at 275, and thus under the policy, Garfield was not obligated to notify Public Service "as soon as practicable" of Zwillinger's 1991 grumblings. *See Merchants Mut. Ins. Co. v. Hoffman,* 56 N.Y.2d 799, 452 N.Y.S.2d 398, 399, 437 N.E.2d 1155, 1156 (1982) ("When the facts of an occurrence are such that the insured acting in good faith would not reasonably believe that liability on his part will result, notice of occurrence given by the insured to the insurer is given 'as soon as practicable' if given promptly after the insured receives notice that a claim against him will in fact be made."); *Sparacino,* 50 F.3d at 143 (delay in notifying an insurer of an "occurrence" may be excused "by proof that the insured either lacked knowledge of the occurrence or had a reasonable belief of nonliability."). Indeed, it is arguable whether the brief period in which Zwillinger was exposed to malodorous carpet fumes constitutes "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"—which is the definition of the term "occurrence" contained in the liability policy. *See* Goldman Aff. Exh. E, Commercial General Liability Form § V ("Definitions"), ¶ 9, at 8.

Garfield also alleges that it did not believe the 1991 Zwillinger incident implicated its liability policy. Carella Aff. ¶ 10. This allegation is consistent with the fact that Garfield apparently did not seek to recover carpet removal costs from any of its liability insurers. Moreover, the kind of injuries to which a reasonable insured might expect smelly carpet to give rise—i.e., aggravation, inconvenience, annoyance, etc.—are plainly not those that would typically implicate a liability policy. Thus, Garfield also contends that its reasonable, good faith belief that Zwillinger's 1991 complaints were not covered by its Public Service policy also excuses any delay in reporting the incident to Public Service. *See Mighty Midgets v. Centennial Ins. Co.,* 47 N.Y.2d 12, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979) (holding that good faith, reasonable belief that incident was not covered by liability policy could excuse delay in reporting occurrence); *Avondale Indus., Inc. v. Travelers Indem. Co.,* 774 F.Supp. 1416, 1431 (S.D.N.Y.1991) ("[L]ate notice to a particular insurer might be excused by an insured's reasonable and good faith belief that an occurrence could lead to no liability *that would be indemnifiable under that insurer's policies.*") (emphasis original).

Garfield's nonliability and noncoverage allegations are at least sufficient to defeat Public Service's motion for summary judgment. *See G.L.G. Contracting Corp. v. Aetna Cas. & Sur. Co.,* 215 A.D.2d 821, 626 N.Y.S.2d 307, 309 (3d Dep't 1995) (holding that it was a

jury question as to whether general contractor's belief in nonliability for injury sustained by subcontractor's employee injured on common work site was reasonable in light of circumstances and general contractor's belief that any liability would be covered by workers' compensation); *Kreger Truck Renting Co., Inc. v. American Guar. & Liability Ins. Co.*, 213 A.D.2d 453, 623 N.Y.S.2d 623, 624 (2d Dep't 1995) (holding that it was question for jury as to whether commercial landlord's belief in nonliability for damages tenant claimed were due to faulty maintenance of the building was reasonable in light of all the relevant circumstances); *U.S. Underwriters Ins. Co. v. Congregation B'Nai Israel*, 900 F.Supp. 641, 646 (E.D.N.Y.1995) ("It is generally only where the insured offers no excuse for the delay that a court may find, as a matter of law, that the delay was unreasonable."), *aff'd* 101 F.3d 685 (2d Cir.1996).

▬ In opposition, Public Service argues that "no reasonable person in Garfield's place would have believed that it had completely 'eliminated' any possibility of liability arising from the Zwillinger Occurrence given the litany of serious health complaints made by Zwillinger[.]" Def. Mem. in Supp. Summ. J. at 32. Yet such a belief in the "complete[ ] eliminat[ion]" of possible liability is not the relevant standard here; a remote possibility of liability may not even give rise to a duty to notify an insurer. *See American Ins.*, 56 F.3d at 439. Moreover, even though a severe injury may be enough to make unreasonable, as a matter of law, an insured's belief in nonliability, the two cases Public Service cites for support are readily distinguishable from this one.

Specifically, in *White v. City of New York*, 81 N.Y.2d 955, 598 N.Y.S.2d 759, 760, 615 N.E.2d 216, 217 (1993), the injured party suffered a fractured skull for which she required six days' hospitalization, and the incident giving rise to the injury was the object of a police incident report. In *Winstead v. Uniondale Union Free School Dist.*, 201 A.D.2d 721, 608 N.Y.S.2d 487, 488–89 (2d Dep't 1994), the injured party was also hospitalized and the aggression that caused the injury was investigated by the police. By way of contrast, this case is more closely analogous to those cases that hold that where the concerned injuries are latent, or where other circumstances diminish the possibility of a claim, notice is timely given when it is provided upon the receipt of a summons and complaint. *See Argentina*, 631 N.Y.S.2d at 126, 655 N.E.2d at 167 (holding that while slip-and-fall accident required emergency room treatment, because there was nothing to suggest permanent ongoing injuries, because the postaccident investigation suggested no possibility of a tort claim, and because the accident victim and insured had a close relationship that reasonably led the insured to believe it would have been apprised by the victim of any serious threat of suit, the insured's delay in reporting the incident was excused); *Briggs v. Nationwide Mut. Ins. Co.*, 176 A.D.2d 1113, 575 N.Y.S.2d 413, 414 (3d Dep't 1991) (holding that where victim's back injury occurred in unusual circumstances—i.e., while being jounced in her seat during pleasure boat ride—and where victim was taken to emergency room for x-rays and discharged with instructions to take Tylenol for her back pain, learning the full extent of her injury only 30 months after incident, then insured's delay in reporting incident to insurer would be excused).

▬ Nor would the "Consumer Alert" that Zwillinger attached to her October 29, 1991 letter necessarily prompt a reasonable insured to undertake an elaborate investigation into its potential tort liability for new-carpet fumes. *See* Lalande Aff. Exh. K. That "Alert" merely indicates that the *long-term* consequences of exposure to chemicals "off-gassed" by new carpet are largely unknown and that some consumers had experienced health problems that may or may not have been associated with such "off-gassed" chemicals. *Id.* However, in this case, the smelly carpet was removed within a month of its installation and within two weeks of Zwillinger's letter, and thus Garfield reasonably could not have expected that Zwillinger's grousing was the harbinger of maladies such as those alluded to in the "Consumer Alert," which speculated about injuries that might result from *long-term* exposure to "off-gassing" carpet. Thus, contrary to Public Service's suggestions, this "Alert" is hardly the

type of document that would be likely to induce Garfield or other reasonable insureds to investigate potential tort liability for injuries caused by "off-gassing" carpet. *See Mount Vernon Fire Ins. Co. v. East Side Renaissance Assocs.*, 893 F.Supp. 242, 248–49 (S.D.N.Y.1995) (holding that Order from the New York City Health Department, Bureau of Lead Poisoning, apprising building manager that tenant had been found to have elevated "blood-lead" level, did not constitute "occurrence" that had to be reported to insurer promptly).

 Public Service also argues that Garfield's conduct in 1991 indicates that it actually believed that it might be liable for injuries caused by carpet fumes. The evidence on this score is insufficient to support Public Service's motion for summary judgment. The fact that Garfield attempted to accommodate Zwillinger by selecting a special carpet adhesive, by seeking to have incorporated into the carpeting contract certain provisions that she requested, and by ultimately removing the carpet does not compel the conclusion that Garfield believed it might be *liable* to Zwillinger if it did not undertake these actions. Indeed, Garfield has indicated that its decisions to remove the carpet and use a special adhesive stemmed from a neighborly concern for Zwillinger's irritation. Garfield may also have removed the carpet because it accepted Zwillinger's view that it would ultimately be forced to do so anyway and it would incur the costs of defending against Zwillinger's threatened suit for "quiet enjoyment."

 Public Service's final assertion, that it was "severely prejudiced" by Garfield's actions, is not a relevant consideration in assessing the timeliness of a notice of an "occurrence." *See Briggs*, 575 N.Y.S.2d at 414–15 (holding that it was error to consider the issue of prejudice in evaluating an excuse for untimely notification). Even if it was a relevant consideration, Public Service's conclusory assertions here fail to establish that it suffered any prejudice as a result of the delay in receiving notification of the 1991 Zwillinger incident. Public Service's contention, that Garfield's actions deprived it of an opportunity to examine the "off-gassing" carpet, is exaggerated: the same carpet remains in Garfield's other building. Public Service's complaint, that it was not given the opportunity to take appropriate protective measures, is also overdrawn; it is difficult to conceive of a more effective protective measure than that which Garfield took—i.e., removal of the malodorous carpet.

### 3. Timely Notice of "Claims"

 Public Service also contends that the October 29, 1991 letter Zwillinger sent to Garfield's shareholders was a "claim" and that failure timely to forward a copy of that letter to Public Service entitles the latter to summary judgment. In relevant part, Zwillinger's October 29, 1991 letter stated the following:

> So there are two choices to be made here: (1) remove the carpet immediately—I promised to put in $600—personally for lineoleum [sic] which is the safest way to go. (2) you can do nothing and I will initiate a lawsuit. You are obligated to provide "Quiet Enjoyment" for all shareholders as per instructions from my attorney. Legal costs will be high for everyone [and] you will be obligated to remove the carpet anyway and also pay my medical bills which will be @ $3,000.00-$5,000.00 for my treatment.
>
> So its up to you. I've been patient but no longer. You have until Nov. 10th to have the building made habitable for me. Also after that date I will no longer pay $600.00 for new lineoleum [sic] as I will have to pay rent where I am staying now.
>
> I am very disappointed and angry with you—as friends and neighbors for so long—I expected better MORAL treatment. So now we have a legal issue.

Lalande Aff. Exh. J (emphasis original). As a post-script to this letter, Zwillinger added:

> I remain ever hopeful that we can settle this in a friendly and mutually beneficial manner. You know me to be reasonable and sensible. I expect the same from you guys!

*Id.*

 Under New York law, timely notification of a "claim," like timely notice of an

"occurrence," is a condition precedent to insurance coverage. *See State of New York v. Blank,* 27 F.3d 783, 794 (2d Cir.1994) (the same policy considerations that are responsible for making timely notice of "occurrences" a condition precedent to coverage are also responsible for making timely notice of "claims" a condition precedent to coverage, "particularly the concerns over an insurer's capacity to conduct litigation and settlement negotiations[.]"). However, assessing compliance with a notice-of-claim provision requires a somewhat different focus than that used to ascertain compliance with a notice-of-occurrence provision:

> A notice of occurrence provision thus focuses on the insured's knowledge of events and reasonable conclusions based on that knowledge.... As we noted in *Blank,* "if insureds were required to notify insurers of every incident that poses even a remote possibility of liability, insurers would soon be swamped with notice of minor incidents that pose little danger [of liability]."...

> A notice of claim provision, however, focuses on the actions of third parties and may be triggered by an unreasonable—even sanctionable—assertion of liability. We have thus noted that one harm caused by vexatious litigants who bring baseless lawsuits against lawyers is the need of those lawyers to notify their insurance carriers.... An assertion of possible liability, no matter how baseless, is therefore all that is needed to trigger a notice of claim provision.

*American Ins. Co. v. Fairchild Indus., Inc.,* 56 F.3d 435, 439 (2d Cir.1995) (quoting *Blank,* 27 F.3d at 795) (citations and note omitted). Moreover, unlike an "occurrence," delay in notifying an insurer of a "claim" cannot be excused by an insured's good faith, reasonable belief in nonliability or noncoverage—even if the asserted "claim" is manifestly "baseless." *American Ins.,* 56 F.3d at 439; *Blank,* 27 F.3d at 796.

The liability policy at issue here does not define the term "claim." Faced with a similar omission, the Second Circuit recently suggested a broad definition of the term:

> We first address the meaning of "claim." Unlike the term "occurrence," which leaves room for differences of opinion as to whether a particular event is likely to lead to liability under the relevant policy, the term "claim" would not seem to be a fertile ground for disputes. Giving the term its ordinary meaning, a claim is an assertion by a third party that in the opinion of that party, the insured may be liable to it for damages within the risks covered by the policy. It "must relate to an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer." ... A claim may be made without the institution of a formal proceeding. Indeed, the pertinent provisions of the polices at issue distinguish between "a claim" and "a suit." A third person's assertion of liability is a claim, moreover, whether or not there is reason to believe that there actually is liability. Unless the assertion is made in circumstances so unusual that they negate the possibility of a formal proceeding involving defense costs as well as liability, virtually any assertion of an exposure to liability within the risks covered by an insurance policy is a claim.

*American Ins.,* 56 F.3d at 439 (quoting *Evanston Ins. Co. v. GAB Bus. Servs., Inc.,* 132 A.D.2d 180, 521 N.Y.S.2d 692, 695 (1st Dep't 1987)) (emphasis added; citation omitted).

The *American Insurance* Court, however, did not rely on its definition of the term "claim" for its *ratio decidendi,* because it was reluctant to apply New York law to foreclose coverage in circumstances in which "no New York case has as of yet addressed that precise issue." *American Ins.,* 56 F.3d at 437, 439–40. While it observed that a "powerful argument" could be made that a letter an insured received from state environmental regulators was a "claim"—both because the letter "stated that it constitute[d] a claim by the State of New York under CERCLA[,]" and because it stated that the insured "may be liable for the present and future costs of response, removal and remediation"—the Court of Appeals declined to decide the case on that ground. *Id.* at 437, 439–40. Instead, it held that well before notice was actually provided, the insured's negotiations with the concerned regulators made it clear that there

was a "claim" requiring notification of the insurer, "even under a narrow—even unreasonably narrow—interpretation of the term[.]" *Id.* at 440.

 Just as in *American Insurance,* no New York court has spoken to the precise definitional issue presented by the circumstances here. Nevertheless, New York case law provides some general guidance as to how undefined terms in insurance contracts should be construed. Specifically, New York cases recognize that insurance contracts are written by insurance carriers for lay persons, and thus they should be construed in accordance with a reasonable person's understanding of the vernacular. *See HS Equities, Inc. v. Hartford Acc. & Indem. Co.,* 609 F.2d 669, 673 (2d Cir.1979) (observing that the general rule with respect to interpretation of insurance provisions is "that the words used in an insurance contract are to be given their normal meaning absent a clear showing of contrary intention[.]") (note omitted); *see generally* 69 N.Y.Jur.2d, *Insurance* §§ 705–706, at 97–99 (1988) (observing that insurance contract terms are "taken and understood in their plain, ordinary, and popular sense, rather than in a philosophical, literal, or technical sense," and that the "ordinary and popular sense" of terms is determined by reference to "what the particular language conveys to the average or ordinary man"). This is particularly critical with respect to language that triggers an obligation on the part of the insured to take some action or forfeit the benefits of coverage under the concerned policy.

Most fundamentally, the word "claim" connotes:

a(1) An authoritative or challenging request ... (2): a demand of a right or supposed right ... (3): a calling on another for something due or supposed to be due ... **b:** a demand for compensation, benefits, or payment (as one made in conformity with provisions of the Social Security Act or of a workmen's compensation law, one made under an insurance policy upon the happening of the contingency against which it is issued, or one made against a transportation line because of

loss occasioned by carrier negligence or overcharge)[.]

*Webster's Third New International Dictionary* 414 (1981). The case law reflects this common understanding of the term. Indeed, the *American Insurance* Court partially defined a "claim" as " 'a type of *demand* that can be defended, settled and paid by the insurer.' " *American Ins.,* 56 F.3d at 439 (quoting *Evanston Ins. Co.,* 521 N.Y.S.2d at 695) (emphasis added); *see also Atlas Underwriters, Ltd. v. Meredith–Burda, Inc.,* 231 Va. 255, 258, 343 S.E.2d 65 (1986) (" 'Claim' contemplates the assertion of a legal right by a third person for damages caused by conduct of the named insured[;][i]t means a demand by one to whom a right has accrued for payment of a loss suffered due to acts of the insured that are covered by the policy."); *San Pedro Properties, Inc. v. Sayre & Toso, Inc.,* 203 Cal.App.2d 750, 755, 21 Cal.Rptr. 844 (2d Dist.1962) ("The word claim is derived from the latin *clamor,* meaning a call, a demand[;][i]n its ordinary sense the term imports the assertion, demand, or challenge of something as a right; the assertion of a liability to the party making it to do some service or pay a sum of money.").

In this case, Zwillinger's October 29, 1991 letter to Garfield was a demand that smelly carpet be removed and replaced with odorless linoleum. While Zwillinger's letter threatened a lawsuit for breach of a covenant of "quiet enjoyment" if the smelly carpet was not removed and replaced, she offered to contribute $600.00 to defray the costs associated with these actions. Thus, a reasonable person in Garfield's place would not have understood Zwillinger's letter to constitute a "claim" or demand for damages for personal injuries. Moreover, unlike *American Insurance,* where subsequent discussions with the insured eliminated any doubt that a "claim" was being made, *American Insurance,* 56 F.3d at 440, Garfield's immediate decision to comply with the only demand in the purported "claim" letter eliminated any possible basis for considering it as a "claim" or a potential "claim."

I recognize that the *American Insurance* definition of "claim" encompasses "an assertion by a third party that in the opinion of

that party the insured may be liable to it for damages within the risks covered by the policy." *Id.* at 439. Read literally and out of context, this definition could apply to Zwillinger's threat to sue for damages if Garfield did not accede to her demand for removal of the smelly carpet, since implicit in such a demand is the suggestion that Garfield may be liable for damages. Nonetheless, it is dangerous to take a general definition, sound as applied in most contexts, and apply it to every case, without taking into account the particulars of that case. A suggestion that an insured "may" be liable to a third party for damages can be made in circumstances in which it clearly constitutes a demand for payment or performance for which the insured will look to his insurer for reimbursement. *American Insurance* was such a case. The unusual and distinguishable circumstances here, however, compel a different conclusion, because the only "claim" or "demand" made by Zwillinger's letter was for removal of malodorous carpet.[1]

### 4. The Pollution Exclusion

 Public Service finally argues that the claims raised in the *Zwillinger* action are excluded by the policy's "Absolute Pollution Exclusion," and, therefore, it has no obligation to defend or indemnify Garfield with respect to those claims. To "negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case[.]" *Continental Cas. Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 972, 609 N.E.2d 506, 512 (1993) (citing for authority *Seaboard Surety Co. v. Gillette,* 64 N.Y.2d 304, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984)). "Policy exclusions are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction[.]" *Incorporated Village of Cedarhurst v. Hanover Ins. Co.,* 89 N.Y.2d 293, 653 N.Y.S.2d 68, 70, 675 N.E.2d 822, 824 (1996) (internal quotations and citation omit-

ted); *accord Stoney Run Co. v. Prudential– LMI Commercial Ins. Co.,* 47 F.3d 34, 37 (2d Cir.1995) ("Any ambiguity is to be construed against the insurer, particularly when the ambiguity is in an exclusionary clause."). "An exclusionary clause, moreover, can be ambiguous in one context and not in another." *Stoney Run,* 47 F.3d at 37. Nonetheless, regardless of the context, "[w]hen construing an insurance policy, the tests applied are 'common speech' and the 'reasonable expectation and purpose of the ordinary businessman.'" *Id.*

In *Stoney Run,* the Second Circuit was asked to construe the following pollution exclusion, which is materially indistinguishable from the one at issue here:

This insurance does not apply to: (f)(1) "Bodily injury" or "property damage" arising out the actual, alleged or threatened discharge, dispersal, release or escape of pollutants: (a) [a]t or from premises you own, rent or occupy[.] Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Id.* at 36. The Second Circuit held that such exclusions are to be construed "in light of [their] general purpose, which is to exclude coverage for environmental pollution." *Id.* at 37. As a result, the insurer-defendant in *Stoney Run* was held to have an obligation to defend the insured-plaintiff, an apartment owner, with respect to tort actions brought against the insured for carbon monoxide poisoning brought about by the faulty operation of a heating and ventilation system in the insured's apartment complex. *Id.* at 39 ("As noted above, the pollution exclusion clause can reasonably be interpreted as applying only to environmental pollution[;][a] reasonable policyholder might not characterize the escape of carbon monoxide from a faulty residential heating and ventilation system as environmental pollution[;][a]ccordingly, we find the pollution exclusion clause ambiguous

---

1. Even if Zwillinger's letter were deemed a "claim," a serious question remains as to whether it is the *same* "claim" that Zwillinger makes in her 1994 complaint. Her 1991 letter threatens suit for "quiet enjoyment," whereas her 1994 complaint sues for tortious negligence. Since neither party directly raises this issue, however, it is not necessary to address it here.

as applied to the[se] actions."). *See also Lefrak Org., Inc. v. Chubb Custom Ins. Co.,* 942 F.Supp. 949, 954 (S.D.N.Y.1996) (applying *Stoney Run* and concluding that pollution exclusion's applicability to lead-poisoning claim was ambiguous, because lead paint might not be deemed an environmental pollutant insofar as it was released inside, and thus insurer was obligated to defend insured with respect to lead-poisoning claim).

This case is directly analogous to *Stoney Run.* Public Service's "Absolute Pollution Exclusion" reasonably may be construed to bar recovery only for those bodily injuries caused by environmental pollution. Because the carpet fumes at issue here were released inside, and because they typically are not the kind of environmental pollution about which state and federal regulators are concerned, it is at least ambiguous whether they fall within Public Service's "Absolute Pollution Exclusion." Public Service's attempts to cast doubt on the continuing authority of *Stoney Run Co.,* and thereby bring carpet fumes unambiguously within the Exclusion, are unavailing. *See* Def. Reply Mem. Supp. Summ. J. at 12–13.

Attempting to avoid the result that *Stoney Run* so obviously compels, Public Service contends that three recent New York Court of Appeals' decisions overrule *Stoney Run.* The cases upon which Public Service relies all involved environmental pollution, and thus the issue of whether pollution exclusions were ambiguous with respect to non-environmental pollutants was neither addressed by, nor even mentioned in, these cases. *See Northville Indus. Corp. v. National Union Fire Ins. Co. of Pittsburgh,* 89 N.Y.2d 621, 657 N.Y.S.2d 564, 566–67, 679 N.E.2d 1044, 1046–48 (1997) (pollutants at issue were gasoline that had leaked from insured's petroleum storage and distribution center); *Incorporated Village of Cedarhurst,* 653 N.Y.S.2d at 70–71, 675 N.E.2d at 824–25 (declining to even reach issue of whether raw sewage was pollutant); *Town of Harrison v. National Union Fire Ins. Co. of Pittsburgh,* 89 N.Y.2d 308, 653 N.Y.S.2d 75, 75–78, 675 N.E.2d 829, 829–32 (1996) (pollutants at issue were toxic materials placed in city landfill).

With respect to the last of these cases, Public Service misconstrues the New York Court of Appeals' decision, claiming that *Town of Harrison* holds that pollution exclusions are unambiguous for all purposes. In *Town of Harrison,* claims were filed against the insured municipality for improper disposal of toxic material. The Town of Harrison argued that the pollution exclusion in its liability policy was ambiguous as to coverage of these claims, because there was a question as to whether the Town of Harrison was responsible for dumping the toxic material. The Court of Appeals held that the language of the applicable policy's exclusion was not ambiguous on this point:

> Contrary to the Appellate Division's reading of these clauses, we detect no ambiguity regarding the scope of the pollution exclusions. Where the terms of an insurance policy are clear and unambiguous, interpretation of those terms is a matter of law for the court[.] ... Construing the terms of these exclusions as required, by giving the words their plain meaning, it is evident that coverage is unavailable for any claim involving the discharge or dispersal of any waste, pollutant, contaminant, or irritant regardless of the cause or source of that claim[.] ... Therefore, coverage is unambiguously excluded for claims generated by the dumping of waste materials onto claimant's properties as asserted in all of the underlying complaints, irrespective of who was responsible for these acts[.]

*Town of Harrison,* 653 N.Y.S.2d at 78, 675 N.E.2d at 832 (citations omitted).

Thus, in *Town of Harrison* the New York Court of Appeals did not hold that pollution exclusions are unambiguous *for all purposes.* It merely refused to find that the pollution exclusion at issue there was ambiguous with respect to claims arising out of the dumping of environmental waste when the identity of the party responsible for dumping the waste was in doubt. Indeed, in addressing the appellant's arguments, the Court of Appeals proceeded to reaffirm its earlier holding in *Continental Casualty Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993), wherein it observed

that pollution exclusion "[c]lauses can, of course, be ambiguous in one context and not another[.]" *Id.* at 972, 609 N.E.2d at 512; *Town of Harrison,* 653 N.Y.S.2d at 78, 675 N.E.2d at 832. Therefore, it is not surprising that on at least two recent occasions, intermediate New York appellate courts have relied on *Stoney Run* for the proposition that pollution exclusions, like the one at issue here, are ambiguous with respect to non-environmental pollutants. *See GA Ins. Co. of New York v. Naimberg Realty Assocs.,* 233 A.D.2d 363, 650 N.Y.S.2d 246, 247 (2d Dep't 1996); *Cepeda v. Varveris,* 234 A.D.2d 497, 651 N.Y.S.2d 185, 186 (2d Dep't 1996). Indeed, *Cepeda* was decided shortly *after* the *Incorporated Village of Cedarhurst* and *Town of Harrison* decisions were issued.

## CONCLUSION

Public Service's motion for dismissal or summary judgment is denied and Garfield's cross-motion to implead Public Service into the *Zwillinger* action (94–CV–4009) is granted.

**SO ORDERED.**