General Ins. Co. of Am. v Marvel Enters. (2004 NY Slip Op 50129(U))

[*1]

General Ins. Co. of Am. v Marvel Enters.

2004 NY Slip Op 50129(U)

Decided on March 9, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 9, 2004

Supreme Court, New York County
 GENERAL INSURANCE COMPANY OF AMERICA, INC., Plaintiff,
against
MARVEL ENTERPRISES, INC., Defendant.
Index No. 604690/01

HERMAN CAHN, J
Motion sequence numbers 002 and 003 are consolidated for disposition.
Plaintiff General Insurance Company of America, Inc. (GICA) moves to (a) confirm the Report of the Special Referee, and (b) granting it summary judgment, i.e., a declaration that it has no duty to defend or indemnify defendant Marvel Enterprises, Inc. in an underlying federal lawsuit (motion sequence number 002). Defendant Marvel moves to vacate the Special Referee's report, and (b) granting it summary judgment, i.e., a declaration that GICA is obligated to defend it in that underlying action (motion sequence number 003). BACKGROUND
In April 2000, GICA issued a media liability insurance policy to Marvel covering the period April 30, 2000 to April 30, 2001. Pursuant to that policy, GICA agreed to defend and indemnify Marvel for claims arising out of copyright infringement, misappropriation of ideas, trademark infringement, unfair competition, deceptive trade practices and fraud.
In early 2001, a dispute arose between Marvel and Twentieth Century Fox Film Corporation (Fox) regarding the extent of certain rights that Fox had acquired to the Marvel comic book characters known as the "X-Men." In a 1993 licensing agreement, Marvel had granted Fox the rights to create, produce, distribute and promote live action feature length theatrical motion pictures, based on these copyrighted comic book characters. In 1999, Fox had exercised its rights, and produced a feature film entitled "X-Men," which was released, successfully, to theaters in July 2000.
Almost immediately thereafter, in August 2000, Marvel began developing the idea for a new television series that was to feature new Marvel characters who, as a result of genetic experiments, displayed physical mutations. On August 9, 2000, Marvel entered into a production agreement with Tribune Entertainment Company for a weekly television series of hour-long shows based on this concept. Promotional materials concerning the series, which ultimately came to be titled "Mutant X," were distributed to the entertainment industry trade beginning in January 2001.
Fox objected to the development of the new television series, claiming that it was merely a thinly veiled version of "X-Men." Following an exchange of correspondence and discussion in which Fox voiced is objections, it sent Marvel a letter, dated March 19, 2001, asserting its position that the production and distribution of the "Mutant X" series violated the Lanham Act [*2]and related common-law principles of trademark law and unfair competition, and constituted a breach of their Licensing Agreement (see Callagy Aff., Ex. Q). The letter contained the following demand:

Fox hereby demands that any further development, production and distribution of "MUTANT X" cease immediately, and Fox will take all appropriate action to enforce its rights, and will seek such remedies as may be necessary to protect itself against such a flagrant and willful breach of our agreement.
(Id., at 1). At the end of the letter, Fox additionally requested that:

[I]n order to prepare for the contingency of litigation Marvel retain all documents, including e-mails, related to this project and notify Tribune Entertainment, Fireworks and any other entities involved with the production or distribution of "MUTANT X" to do the same.
(Id., at 7-8). The letter further stated that "[t]he foregoing is not a complete statement of the facts or of Fox's position or potential claims or causes of action against you, and all of Fox's rights and remedies are reserved." (Id., at 8).
 Upon receipt of the letter, Marvel faxed a copy to Hilb, Rogal and Hamilton Company of New York, Inc. (HRH), its insurance broker, with a cover sheet indicating that the letter was being forwarded "because it might result in litigation from Fox regarding Mutant X" (see Callagy Aff., Ex. N). Although HRH set up a file for the letter, it did not notify GICA or First Media Insurance Agency, GICA's agent, of the letter's receipt or contents. Instead, after reviewing the letter, the claims manager at HRH concluded that it was not necessary to submit a Notice of Claim to GICA at that time. Specifically, in an exchange of internal e-mails, the HRH claims manager noted that no claim for damages had been asserted by Fox; although the claims manager characterized the letter as a "claim for injunctive relief," he concluded that notification to GICA was not required, as no suit had yet been filed. (Callagy Aff., Exh. O).
Meanwhile, on or about March 22, 2001, Marvel engaged the law firm of Kenyon & Kenyon, Esqs. to investigate Fox' allegations and claims, and to otherwise counsel and assist Marvel in its preparation for possible litigation. Shortly thereafter, upon concluding that litigation was all but inevitable, Marvel authorized its outside counsel to prepare and file an action seeking a declaratory judgment that the production and distribution of the "Mutant X" series did not violate Fox' intellectual property rights, or otherwise breach the Licensing Agreement.
Marvel's declaratory judgment action, entitled Marvel Entertainment Group, Inc. v Twentieth Century Fox Film Corp. (01 Civ 3017 [SD NY]), was commenced on April 10, 2001. That same day, and almost immediately prior to Marvel's filing, Fox commenced its own action, also in the Southern District. In that action, entitled Twentieth Century Fox Film Corp. v Marvel Enterprises, Inc., et al. (01 Civ 3016), Fox alleged causes of action against Marvel for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, copyright infringement, deceptive business practices under Section 349 of New York's General Business [*3]Law, and common-law unfair competition.[FN1] The two actions were consolidated by the District Court, and Fox moved, almost immediately, for injunctive relief.
It appears that GICA first learned of the federal court actions shortly thereafter, on or about April 12, 2001, when someone spotted information related to the dispute on the internet, and contacted First Media. First Media then contacted HRH. In response to First Media's inquiry, on April 17, 2001, HRH forwarded to First Media copies of both complaints, as well as certain other papers, including the March 19, 2001 letter from Fox. HRH also provided First Media with Marvel's Notice of Claim.
In a letter to HRH dated April 18, 2001, one day later, First Media acknowledged and responded to its receipt of these documents and of Marvel's Notice of Claim (Callagy Aff., Ex. R). In its letter, First Media noted that the policy excluded coverage for claims arising from breach of contract, and thus coverage would not be available for any legal expense or loss arising from the contract causes of action. First Media further advised that Marvel's declaratory judgment action did not fall within the definition of "claim" contained in the policy. First Media indicated, however, that the policy did provide coverage for copyright and trademark infringement, unfair competition relating thereto, and deceptive trade practices. As to these claims, it requested that HRH provide additional information concerning the underlying dispute. It also reserved all of GICA's rights under the policy as to these causes of action.
Although First Media made occasional inquiries regarding the status of the underlying litigation over the following months, GICA did not otherwise involve itself in the federal court litigation. Then, in July 2001, HRH tendered to First Media four invoices, totaling $952,483.37, that Marvel had received from Kenyon & Kenyon for legal services and disbursements incurred between March 22, 2001 and June 30, 2001. HRH advised First Media that Marvel had paid Kenyon & Kenyon directly for the fees incurred between March 22 and March 31, 2001, which amounted to $41,200.75 of the total amount due, and requested that GICA pay the remaining balance, less $8,799.25 (the balance of Marvel's $50,000.00 retention under the policy).
Shortly thereafter, on October 1, 2001, GICA commenced the instant action for a declaratory judgment. In the complaint, GICA alleged that the claims asserted by Fox in the federal court litigation, all fall within the breach of contract claims exclusion of the policy. GICA further alleged that Marvel failed to cooperate, by not apprising it of developments, or providing it with information necessary to assess coverage. In addition, GICA alleged, for the first time, that Marvel's Notice of Claim was untimely. Specifically, GICA alleged that Marvel had failed to comply with the notice provisions in the policy, by failing to submit a Notice of Claim upon receipt of the March 19, 2001 letter from Fox.
In its response, Marvel asserted a counterclaim, for a declaratory judgment in its favor. Marvel subsequently moved for summary judgment with respect to the causes of action asserted by GICA.
In an order and decision dated June 26, 2002, this court granted Marvel's motion for summary judgment in part, finding that, except for two contract claims, all of the claims asserted [*4]by Fox against Marvel in the federal court litigation fell within the risks covered by the policy, and thus that GICA was obligated to defend Marvel in the federal suit. The court additionally found that GICA had failed to establish that Marvel breached its obligation to "cooperate" with GICA.
However, the court denied Marvel's motion with respect to GICA's claim that the Notice of Claim was untimely, finding issues of fact as to whether the March 19, 2001 letter from Fox to Marvel constituted a demand for relief that qualified as a claim under the terms of the policy, and, if so, whether the 29-day interval between that letter, and Marvel's April 17, 2001 Notice of Claim to GICA, qualified as timely notice. Marvel's motion for summary judgment was held in abeyance, while both issues were referred to a Special Referee to hear and report.
The reference was heard by Special Referee Marian Lewis over five separate dates. In a Report dated June 4, 2003, the Special Referee concluded that the March 19, 2001 letter from Fox constituted a claim under the policy, and, thus, that Marvel's April 17, 2001 Notice of Claim was untimely.
GICA now moves to confirm the Referee's Report. Marvel moves to vacate it. Both parties move for summary judgment.
DISCUSSION
Waiver of Late Notice Defense
At issue here is whether the Special Referee's findings, are supported by the record.
In the decision and order dated June 26, 2002, this court determined that all but two of the claims asserted by Fox against Marvel, in the federal court litigation, fell within the risks covered by the policy, and that, unless it were found that Marvel provided GICA with late Notice of Claim, GICA had a duty to defend Marvel in that litigation.
Marvel argues that the Report of the Special Referee should be rejected, because GICA waived its late notice defense by failing to include the defense among its grounds for denying coverage in its original, April 18, 2001, "letter of disclaimer."
 Courts consistently have held that a defense of late notice may be waived by failing to assert it in a letter of disclaimer where other defenses are asserted (see General Acc. Ins. Group v Cirucci, 46 NY2d 862 [1979]; Appell v Liberty Mut. Ins. Co., 22 AD2d 906 [2d Dept 1964], affd 17 NY2d 519 [1966] ; Benjamin Shapiro Realty Co. v Agricultural Ins. Co., 287 AD2d 389 [1st Dept 2001]). In State of New York v AMRO Realty Corp. (936 F2d 1420, 1431 [2nd Cir. 1991]), the Second Circuit held that, under New York law, "an insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense."
Nevertheless, courts recognize certain exceptions to this rule of waiver. Of particular relevance here, courts have held that an insurer does not waive other defenses if it expressly reserves its right to assert them in the future (see Raniolo v Travelers Indem. Co., 279 AD2d 514 [2d Dept 2001]; National Restaurants Management, Inc. v Executive Risk Indem. Inc., 304 AD2d 387 [1st Dept 2003]).
Here, GICA's April 18, 2001 letter, acknowledging receipt of the Notice of Claim, noted that the policy excluded coverage for claims arising from breach of contract, and thus that coverage would not be available for the contract causes of action. The letter further advised that [*5]Marvel's declaratory judgment action did not fall within the definition of claim contained in the policy.
However, the letter also indicated that the policy did provide coverage for copyright and trademark infringement, unfair competition relating thereto, and deceptive trade practices. As to these claims, First Media requested additional information in order to assess coverage. The letter did not disclaim the obligation to defend or indemnify Marvel as to those claims; rather, the letter expressly reserved all of GICA's rights under the policy as to these causes of action. Specifically, the letter stated:

In citing the insurer's basis for no coverage in respect to the contract cause of action and in citing the insurer's basis for reservation as we investigate coverage for the causes of action potentially subject to coverage, [First Media] acting on behalf of [GICA] reserves all rights under the contract in law and in equity.
Nevertheless, the Second Circuit, in AMRO Realty Corp, found waiver as a matter of law where the letter of disclaimer, although containing a reservation of rights clause, asserted several grounds for disclaimer without mentioning late notice. In AMRO, however, the particular phrase in the disclaimer letter reserved only the insurer's right to "rely on additional reasons for disclaimer should they become apparent in the future" (id., at 1433, fn 13 [emphasis added]). The Second Circuit noted that this particular reservation of rights could not be read to preclude waiver, "as the late notice defense did not 'become apparent" after the ... complaint was filed, but rather was evident at the time" the disclaimer letter was issued (id.). Further, in the body of the decision, the court noted that "we do not address here the case where the insurer's disclaimer of coverage based on specified grounds is accompanied by an express and unequivocal statement that other grounds for disclaimer are reserved and not waived" (id.).
 Here, as in AMRO, GICA appears to have been in possession of all the information it would need to disclaim coverage on the ground of untimely notice. However, unlike the reservation of rights in AMRO, GICA's reservation of rights was not limited solely to those reasons that might "become apparent in the future." Instead, GICA expressly reserved all of its rights under the contract. Under these particular facts, GICA did not waive its late notice defense, as a matter of law, and the Report cannot be rejected on that ground. However, rejection is warranted on other grounds, which follow.
Timeliness of the Notice of Claim 
The Notice of Claim provision in the GICA policy provides that

The insured shall provide notification of any potentially covered claim as soon as reasonably possible to the Company or any of its agents by forwarding all suit papers and documents.
(Callagy Aff., Exh. H, Endorsement 13, at B: Section V - GENERAL CONDITIONS). The policy specifically defines claim as:

[A] demand or suit for money tendered to the insured for loss or injunctive relief, even if any of the allegations are groundless, false or fraudulent, or a request to toll or waive any applicable statute of limitations relating to a claim or potential claim ....
(Callagy Aff., Exh. H, Endorsement 13, at C: Section II - Definitions).
[*6]
In finding that the March 19, 2001 letter qualified as a claim under the policy, the Special Referee placed great emphasis on the actions of Marvel, its counsel, and HRH, upon their receipt of the March 19, 2001 letter. Thus, the Special Referee pointed to evidence indicating that Marvel, its outside counsel, and HRH, all appeared to recognize the letter as a claim which, in all likelihood, would have insurance and jurisprudential ramifications. For example, the Special Referee found that Marvel's early belief, that litigation was all but inevitable, undercut its current contention that the March 19, 2001 letter did not constitute a claim, but that the federal lawsuit filed by Fox on April 10, 2001, was the first claim to trigger the reporting requirement.
The Special Referee also pointed to evidence that the claims manager, in internal discussions at HRH, had characterized the March 19, 2001 letter as "a claim for injunctive relief." She found that the practical construction of the contract by the parties (or in this case, by a representative of a party) prior to inception of litigation was highly persuasive. She additionally noted that HRH, in concluding that it was not necessary to notify GICA of the March 19, 2001 letter, apparently chose to rely on the strict definition of claim contained in the policy, rather than the amendatory "Notice of Claim" endorsement, which required notification of "any potentially covered claim."
GICA argues that the Special Referee's findings are adequately supported by the record and should be confirmed. Marvel argues that her report should be rejected because the language of the policy demonstrates that the March 19, 2001 letter is not a "claim" under this policy.[FN2]
Insofar as the Special Referee found that the March 19, 2001 letter was viewed and treated by defendants as a potential, if not inevitable, claim, her finding is adequately supported by the record. However, the Notice of Claim provision in the policy explicitly requires Marvel to notify GICA only of any "potentially covered claim," it does not require Marvel to give notice of potential claims; nor does it alter or amend the definition of claim contained in the policy.Unlike many policies, in which the term "claim" is undefined and the court must supply a meaning (see e.g., Garfield Slope Housing Corp. v Public Service Mutual Ins. Co., 973 F Supp 326 [ED NY 1997]), the policy at issue here specifically defines claim as "a demand or suit for money tendered to the insured for loss or injunctive relief." Regardless of how HRH chose to characterize Fox's March 19, 2001 letter, "injunctive relief" is, by definition, a judicial remedy; thus, a letter to another party, even one containing strongly worded cease and desist language and a threat of litigation, cannot constitute a demand for "injunctive relief," as that term would ordinarily be understood (see United States Fid. & Guar. Co. v Annunziata, 67 NY2d 229, 232 [1895] [provisions of an insurance policy which are clear and unambiguous should be given their plain and ordinary meaning]).[FN3]
[*7]
When proper deference is given to the definition of term "claim" contained in the policy, the Special Referee's finding, that the March 19, 2001 cease and desist letter qualifies as a claim, does not find support in the record. Accordingly, Marvel's motion to reject the Report of the Special Referee is granted, and GICA's motion to confirm the Report is denied.
In light of the above, Marvel's motion for summary judgment, seeking a declaratory judgment that GICA is obligated to defend it in the underlying federal court actions, is granted.
Accordingly, plaintiff's motion to confirm the Report of the Special Referee is denied, and defendant's motion to reject the Report of the Special Referee is granted, and defendant's motion for summary judgment is granted.
Settle order.
Dated: March 9, 2004
Enter:
__________/S/____________
 J.S.C.
Decision Date: March 09, 2004
Footnotes

Footnote 1: Fox also asserted a claim against Tribune Entertainment Company, Fireworks Communications, Inc., and Fireworks Television (US), Inc. for tortious interference with the Fox Agreement.

Footnote 2: Marvel additionally argues that the Special Referee's Report should be rejected, in any event, because GICA waived its late notice defense by failing to timely disclaim. Marvel also challenges the referral of the timely notice issue to a Special Referee. 

Footnote 3: Unlike an insured's obligation to provide notice of an occurrence, which may be triggered by the insured's knowledge of events and circumstances which would suggest the possibility of a claim, not just the actuality (see e.g., Crucible Materials Corp. v Aetna & Surety Co., 228 F Supp 2d 182 [ND NY 2001], the obligation to provide notice of a claim is triggered by the actions of a third party in asserting liability within the risks covered by the policy (see e.g., Garfield Slope Housing Corp. v Public Service Mutual Ins. Co., 973 F Supp 326 [ED NY 1997], citing American Ins. Co. v Fairchild Indus., Inc., 56 F3d 435 [2d Cir 1995]).